IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

FILED
SEP 02 2022
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | INFORMATION |
| ) | |
| Plaintiff, ) | |
| ) | CASE NO. 4:22 CR 507 |
| v. ) | Title 18, United States Code, |
| ) | Sections 1344(2) and 2. |
| BRIAN SMITH, ) | |
| ) | JUDGE ADAMS |
| Defendant. ) | |
| | MAG JUDGE KNAPP |

GENERAL ALLEGATIONS

At all times material and relevant to this Information:

1. Company A was a facilities management business specializing in energy implementation services, located in Youngstown, Ohio.

2. Company B was an electric utility company headquartered in Akron, Ohio.

3. Defendant Brian Smith was employed as an Outreach Specialist at Company A. Company B hired Company A to implement an energy savings rebate program. Defendant resided in Ashtabula, Ohio.

4. The U.S. Department of Energy provided funding to utility companies across the country to incentivize government, business and homeowners to transform their energy usage from less efficient to more efficient products, including lighting, HVAC applications, and in custom built homes.

5. Company B's involvement in these energy efficiency programs resulted directly from legislation passed in Maryland, Pennsylvania, and Ohio, including Ohio Senate Bill 221. This legislation required that energy demand be managed and that energy savings be achieved.

Rebates would be given to help cover the cost of upgrades. The rebates would be funded by an added fee on the end user's electric bill. Utility companies, including Company B, received millions of dollars in grants and subsidies from the U.S. Department of Energy to pursue these goals.

6. The energy efficiency rebate program implemented and managed by Company A incentivized commercial and industrial businesses, including small business owners, to replace existing fluorescent or lesser efficient incandescent light bulbs and fixtures with more efficient LED bulbs and fixtures. LED bulbs operated at a much lower wattage, thereby requiring less energy usage, and thus resulting in lower electric utility bills. The program enabled small business owners to work with a Company A-approved lighting contractor to pay a smaller co-pay or discounted price for LED replacement bulbs with the understanding that their business utility bills over time will be lower and the business owner will recoup the additional cost of the LED bulbs in energy savings and lower electric costs over time.

7. The energy program offered a rebate incentive to the contractor performing the installation work, or the small business owner if either did the work themselves. The contractor and the business owner agreed on the type of bulbs and fixtures that would be changed and the number of bulbs required. The contractor provided an annual electricity savings estimate based on a Company A lighting calculator. The estimated savings were based upon the number of new LED bulbs being installed and hours of business operation in a year. The lighting calculator provided a total project cost, an annual estimated kilowatt savings, projected utility cost savings and the rebate incentive amount. The rebate incentive amount was calculated by the annual kilowatt hours savings estimate multiplied by 18 cents. For example, if a project was estimated

to save a business 20,000 kilowatt hours a year, the incentive rebate check would be $20,000 multiplied by 18 cents, or an estimated annual savings of $3,600.

8. The contractor invoiced the small business owner for a copay based upon the total estimated project cost. The small business owner signed a Company A Project Completion Report with the contractor to acknowledge the agreed upon work and costs had been completed. Company A then required the contractor to send supporting documents to Company A for the job including the Project Completion Report, a copy of the invoice between contractor and small business owner, a "cut sheet" that identified the types of bulb fixtures used in the job, and a W-9 tax form.

9. Company A maintained an electronic portal that allowed a contractor to upload all these documents directly into the Company A administrative process. Company A had administrative support staff that reviewed the supporting documents for the job and approved the rebate check to be generated and mailed to the contractor who performed the work.

<u>The Scheme to Defraud Company A</u>

10. Acting in his capacity as an employee of Company A, Defendant recruited various friends and family members to incorporate lighting and energy savings contracting businesses to participate in the commercial and industrial energy efficiency programs described above. In return for Defendant identifying, researching and contacting rebate-qualified businesses and referring those leads to his friends and family, Defendant received cash kickbacks, checks and otherwise had complete access to the funds deposited into the bank accounts of his friends' and family's contracting businesses which he used for his own benefit and profit.

3

11. Cooperating Witness 1 (CW-1) was an energy rebate lighting contractor and close friend of Defendant's with direct access to Defendant and many Company A lighting rebate related matters.

12. According to CW-1, in approximately 2015, Defendant approached CW-1 and told CW-1 of a money-making opportunity that CW-1 could participate in if CW-1 opened an energy rebate contracting business. Defendant knew CW-1 was a full-time employee elsewhere but told CW-1 it could be a good part-time job and that CW-1 could make a supplemental income.

13. Defendant told CW-1 that Company A had financial goals to meet in terms of getting small businesses to agree to participate in the rebate program. If CW-1 started an energy contracting business, it would help Company A reach those goals.

14. Ohio Secretary of State records reflected that CW-1 incorporated a CW-1 ENERGY, limited liability company on November 5, 2015, with CW-1 listed as the Registered Agent and CW-1's address was listed as the business location.

15. Shortly afterwards, CW-1 met with Defendant at a restaurant in Youngstown, Ohio. Defendant told CW-1 that the rebate jobs were in Maryland and later in Pennsylvania and Ohio. Defendant told CW-1 that CW-1 would need startup money for CW-1's business to buy the LED light bulbs.

16. Bank-1 was a financial institution, as defined under Title 18, United States Code, Section 20, the deposits of which were insured by the Federal Deposit Insurance Corporation.

17. Defendant caused CW-1 to open a business checking account in the name CW-1 ENERGY, LLC, at Bank-1 account number ending in 4464 (the Bank-1 account), on November 7, 2015, and be the signatory on the account.

4

18. Company B's publicly available website identified CW-1 ENERGY as an approved contractor in the energy rebate program, and that CW-1 has performed on multiple lighting rebate jobs. Company A's business records reflected receipt of multiple invoices from CW-1 ENERGY, along with Project Completion Reports, material and supply cut sheets, all reflecting a business address that was CW-1's home address in Ashtabula, Ohio.

19. Although CW-1 was the authorized signatory on the Bank-1 account, Defendant at all times had and exercised control over and access to the Bank-1 account. Defendant retained possession of all the checkbooks, had an electronic log-on to access the account, and maintained possession of a debit card for the account which contained CW-1's name on the debit card for the Bank-1 account.

20. Within several weeks of CW-1 opening the Bank-1 account, Defendant caused lighting rebate checks from Company A to be mailed to CW-1's home address via the U.S. Postal Service. Shortly thereafter, Defendant began calling CW-1 and requesting that CW-1 withdraw cash from the Bank-1 account. Between approximately January 2016 and February 2018, Defendant contacted CW-1 approximately 2-3 times per month and instructed CW-1 on how much cash to withdraw from the Bank-1 account. Each time, Defendant told CW-1 the amount of cash to keep for himself and the amount of cash to give to Defendant.

21. Defendant caused Company A to mail checks via the U.S. Post Office to CW-1 ENERGY for being the energy contractor for Company A rebate jobs between approximately December 2015 and February 2018, on the dates below:

| Date | Amount | Mailing |
|---|---|---|
| April 30, 2016 | $660 | Company A to Defendant |
| April 30, 2016 | $2,715 | Company A to Defendant |
| May 6, 2016 | $820 | Company A to Defendant |
| May 11, 2016 | $840 | Company A to Defendant |

22. From in or around January 2016, to in or around February 2018, Defendant instructed CW-1 to withdraw deposit checks and withdraw cash from the Bank-1 account.

23. Defendant did not have CW-1 perform any sales calls, meet with any business owners to discuss the rebate program or otherwise generate any business for CW-1 ENERGY. Defendant caused CW-1 to perform four total installations: two in Ashtabula, Ohio and two in Pennsylvania. Defendant did not have CW-1 perform any installations in Maryland. Defendant caused CW-1 to receive rebate checks from Company A for work performed by other contractors in Maryland.

24. Defendant told FBI agents in an interview in December 2018 that he received cash and checks from CW-1 and had access to the Bank-1 account.

## The Scheme to Defraud Company A

25. Defendant fraudulently caused Company A to generate checks made payable to CW-1 ENERGY. Defendant knowingly caused to be delivered by mail the fraudulent checks. Defendant caused the fraudulent checks to be deposited to the Bank-1 account for which Defendant maintained control and use of the funds.

## COUNT 1
(Bank Fraud, 18 U.S.C. § 1344, and 2)

The First Assistant United States Attorney charges:

26. The factual allegations of paragraphs 1 through 25 of this Information are realleged and incorporated by reference as though fully set forth herein.

27. From in or around November 2015, and continuing through in or around December 2018, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant BRIAN SMITH did knowingly execute a scheme and artifice to obtain moneys, funds, credits, assets, securities, or other property owned by or under the control of Bank-1, a federally insured

6

financial institution, by means of false and fraudulent pretenses, representations, and promises, each act constituting a separate count as set forth below:

| Count | Date | Financial Institution | Account | Description of Fraud |
|---|---|---|---|---|
| 1 | 11/07/2015 | Bank-1 | x4464 | Account opening |

In violation of Title 18, United States Code, Section 1344(2).

MICHELLE M. BAEPPLER<br>
First Assistant United States Attorney

By: *[signature]*

MICHAEL L. COLLYER, Chief
White Collar Crimes Unit